**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

GREG GULICK,

    Plaintiff,

        v.

CITY OF PITTSTON,

    Defendant.

CIVIL ACTION NO. 3:CV-12-0141

(JUDGE CAPUTO)

## MEMORANDUM

Presently before the Court is Defendant City of Pittston's (the "City") Motion for Summary Judgment. (Doc. 27.)  Plaintiff Greg Gulick ("Gulick") claims that he was terminated from his employment with the City in violation of his First Amendment association rights.  Additionally, Gulick asserts that the City violated the overtime provisions of the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. §§ 201, *et seq.*, during the course of his employment.[1]  In moving for summary judgment on the First Amendment claims, the City contends that Gulick cannot establish that his political affiliation or association were causally related to his termination.  As to Gulick's FLSA claims, the City argues that it did not violate the FLSA because it did not have knowledge that Gulick worked uncompensated overtime hours.  Because Gulick fails to present evidence from which a reasonable jury could conclude that his political association and/or non-association were "substantial or motivating factor[s]" in his termination, the City's motion for summary judgment on the First Amendment claims will be granted.  However, because issues of fact exist as to whether the City had knowledge that Gulick worked overtime without compensation, summary judgment will be denied on the FLSA claims.

---

[1]     Gulick's Amended Complaint also asserts a Pennsylvania Wage Payment and Collection Law claim. (*Am. Compl.*, Count Three.)  Gulick has withdrawn this claim. (Doc. 35, 31.)  As such, the City's motion for summary judgment on Count Three of the Amended Complaint will be granted without further discussion.

# I. Background

## A.    Factual Background

Gulick was hired by the City on or about July 20, 2006 to serve as the City's zoning officer, code enforcement officer, and administrative assistant. (*Defendant's Statement of Material Facts* "*Def.'s SMF*", ¶¶ 2-3; *Plaintiff's Statement of Facts* "*Plf.'s SMF*", ¶¶ 2-3.) Gulick was hired by the City in 2006 while Joseph Keating ("Keating") was mayor. (*30(b)(6) Dep.*,[2] 13:3-14.),  Keating was mayor from 2006 until 2009. (*Keating Aff.*, ¶ 1.)

In 2009, Keating ran for re-election.  He was challenged in the primary by Jason Klush ("Klush"). (*Klush Dep.*, 6:12-20.)  Keating ran on the same ticket as Councilman Lombardo and Joseph Chernouskas ("Chernouskas"). (*30(b)(6) Dep.*, 100:1-3.) Councilman Lombardo and Chernouskas were running for City Council. (*Id.*)

According to Gulick, he supported Keating for mayor in the 2009 primary election. (*Gulick Dep.*, 30:22-24.)  The 2009 primary was the first election in which he supported Keating. (*Id.* at 32:18-24.)  Gulick informed others that Keating was dedicated and hard-working, and he asked that they vote for Keating. (*Id.* at 31:2-6, 32:8-17.)  Gulick believed that Joseph McClean ("McClean"), a City councilman, was aware of his support for Keating because he told McClean that Keating did a great job and he hoped he would be re-elected. (*Id.* at 37:17-25.)   For similar reasons, Gulick believed that Councilman Lombardo knew he supported Keating because he indicated to Councilman Lombardo that Keating was a good, dedicated mayor. (*Id.* at 38:1-12.)  Gulick further assumed that Klush was aware that he supported Keating, although he had never spoken with Klush. (*Id.* at 37:2-13.)  Klush testified that he only became aware of Gulick's support for Keating after the instant action was commenced. (*Klush Dep.*, 73:10-74:13.)  Gulick further testified that he supported

---

[2]      Councilman Michael A. Lombardo, III ("Councilman Lombardo") testified as the City's corporate designee pursuant to Federal Rule of Civil Procedure 30(b)(6).

Keating by attending a public rally. (*Gulick Dep.*, 31:13-23.) Keating, though, was never informed by Gulick that he was supporting his candidacy for mayor in the 2009 election, and he was "not aware if Mr. Gulick actively supported [his] candidacy for mayor." (*Keating Aff.*, ¶¶ 2-3.)

Gulick did not put up signs in his yard supporting Keating, nor did he make any contributions to Keating's campaign. (*Gulick Dep.*, 31:7-12.) Gulick did not hand out flyers or work the polls for Keating on election day, and he did not wear buttons in support of Keating while he was at work. (*Id.* at 31:24-32:7.)

Keating was defeated by Klush in the 2009 primary election. (*Def.'s SMF*, ¶ 28; *Plf.'s SMF*, ¶ 28.) Keating then resigned from office. (*Id.*) Klush was ultimately elected mayor at the 2009 general election, and he assumed office in January 2010. (*30(b)(6) Dep.*, 13:22-14:2.)

On September 13, 2010, the City provided Gulick with written notice about a hearing relative to his job performance. (*Def.'s SMF*, ¶ 4; *Plf.'s SMF*, ¶ 4.) The notice provided that Gulick: (1) failed to timely respond to complaints and concerns about zoning and code violations; (2) failed to ensure full, complete, and uniform enforcement of the City's Rental Inspection Ordinance; (3) failed to act upon directives by City officials to place the owner of the Wayne's World property on Notice of Public Health/Safety violations and/or hazards; and (4) engaged, at times, in a lack of professional and decorum in the dealing with the public. (*Def.'s SMF*, Ex. C.) With respect to the notice provided to Gulick, there were no specific complaints set forth in the letter. (*30(b)(6) Dep.*, 21:14-16.)

The hearing took place on September 15, 2010. (*Def.'s SMF*, ¶ 5; *Plf.'s SMF*, ¶ 5.) The City's corporate designee testified that there were no specific complaints presented at the September 15, 2010 hearing. (*30(b)(6) Dep.*, 21:16-18.) Moreover, the corporate designee testified that: (1) there were no complaints about Gulick in his personnel file, (*id.*

at 21:19-25); (2) there was no written documentation ever prepared about Gulick failing to respond to concerns or complaints regarding zoning or code violations, (*id*. at 18:13-14); (3) the City had no written documentation concerning Gulick's deficiencies in enforcing the Rental Inspection Ordinance, (*id*. at 23:8-11); (4) there was no written directive to Gulick about what the City wanted done about the Wayne's World property, (*id*. at 43:16-22); and (5) there were no written complaints about Gulick in his personnel file as to his lack of professionalism and decorum when dealing with the public. (*Id*. at 45:25-46:3.)

Gulick maintains that the September 15, 2010 hearing was a sham. (*Plf.'s SMF*, ¶ 4.) In particular, Gulick notes that on September 15, 2010, the same day as the hearing, two draft resolutions were prepared, one which was prepared by Klush, to hire Joseph Moskovitz ("Moskovitz"). (*Plf.'s SMF*, Exs. 7; 12.) Prior to the September 15, 2010 hearing, the City met with Moskovitz in the office of Rose Randazzo, (*Klush Dep.*, 47:16-20), to see if Moskovitz would be interested in employment with the City. (*30(b)(6) Dep.*, 52:6-13.) The meeting was attended by Councilman Lombardo, former City Mayor Mike Lombardo ("former Mayor Lombardo"),[3] and Chernouskas. (*30(b)(6) Dep.*, 52:16-53:1.) Klush indicated that he also attended that meeting. (*Klush Dep.*, 47:16-20.) Despite the draft resolutions on September 15, 2010 to hire Moskovitz, the City's corporate designee testified that the City did not decide to hire Moskovitz prior to or simultaneous with the decision to terminate Gulick, (*30(b)(6) Dep.*, 58:2-12), because the City had reservations about Moskovitz's background, namely, a DUI and a marijuana possession conviction. (*Id*. at 55:13-23.) The corporate designee further testified that Savino Bonita, not Moskovitz, was the first person that the City contacted about the position, but he was not interested in the position. (*Id*. at 50:22-51:13.)

---

[3]     Councilman Lombardo and former Mayor Lombardo are cousins. (*30(b)(6) Dep.*, 50:6.)

On September 19, 2010, Gulick was terminated from his employment with the City. (*Def.'s SMF*, ¶ 7; *Plf.'s SMF*, ¶ 7.) Yet, the City first advertised the Administrator position (which included the tasks performed by Gulick) on September 18, 2010. (*30(b)(6) Dep.*, 67:13-15.) In all, the City advertised the position four times between September 18, 2010 and September 20, 2010. (*Id*. at 66:25-67:12.) Prior to the publication of the advertisement, a draft of the advertisement was circulated by email between Councilman Lombardo, former Mayor Lomardo, Klush, McClean, and Chernouskas. (*Plf.'s SMF*, Ex. 17.) In a response to that email, Councilman Lombardo asked if "anyone [has] spoken to Moskovitz?" (*Id*.)

The City interviewed Moskovitz, David Hines ("Hines"), and Anne Bradbury for the Administrator position. (*30(b)(6) Dep.*, 72:24-73:4, 74:7.) On September 24, 2010, the City hired Moskovitz. (*Id*. at 71:17-21.)

When Moskovitz was hired, his duties included those formerly held by Gulick, specifically code enforcement, zoning enforcement, and various administrative tasks. (*Id*. at 76:1-16.) In 2011, however, the City hired Harry Smith, and his duties included enforcing the Rental Inspection Ordinance and code enforcement. (*Id*. at 26:13-27:3.) And, in September 2012, Hines was hired as operations coordinator, and his tasks included zoning enforcement. (*Id*. at 27:6-11, 30:17-25.)

While he was employed by the City, Gulick was supervised by Keating and Councilman Lombardo, (*Def.'s SMF*, ¶ 41; *Plf.'s SMF*, ¶ 41), but his immediate supervisor was City Clerk Ron Mortimer ("Mortimer"). (*Id*.) Once Councilman Lombardo became Director of Accounts and Finance, he was in charge of Gulick's entire department. (*Def.'s SMF*, ¶ 42; *Plf.'s SMF*, ¶ 42.)

During the course of his employment with the City, Gulick's departmental working hours were thirty-five (35) hours per week, (*Def.'s SMF*, ¶ 40; *Plf.'s SMF*, ¶ 40), and he was paid an hourly rate. (*Gulick Dep.*, 56:13-14.) Gulick reported his hours on time sheets that

were submitted to Mortimer and signed by both Mortimer and him. (*Def.'s SMF*, ¶ 43; *Plf.'s SMF*, ¶ 43.)  Employees indicated they were present by marking "P" on the sheets, but they did not mark the time sheets to reflect the specific number of hours they worked each day. (*Gulick Dep.*, 20:-24-21:10.)  If there was holiday, sick, or vacation time, that time would be marked and coded, such as with an "H" for a holiday. (*Id*. at 19:1-11, 21:4-6, 51:23-52:8.)

Gulick was provided with a copy of the "City of Pittston Administrative Staff Policy" while he was employed by the City, and he was covered under the policy's terms. (*Def.'s SMF*, ¶¶ 44-45; *Plf.'s SMF*, ¶¶ 44-45.)  The overtime provision of the Administrative Staff Policy states:

> Covered employees working beyond or more than the standard departmental working hours or who shall have to work on holidays recognized in the Administrative Staff Policy shall be entitled to compensatory time at straight time, only upon receiving written authorization by the respective Director of the Department on forms to be provided by the employer, prior to working beyond or more than the standard departmental working hours.
>
> Also, all compensatory time authorized and accrued in any given fiscal year shall be used in the same given fiscal year.  Compensatory time shall not be carried forward from one given fiscal year to another.  Covered employees shall also be required to give his/her respective Director of the Department forty-eight (48) hours prior notice before using compensatory time.

(*Def.'s SMF*, Ex. F.)

When Gulick accrued compensatory time, this would not reduce the number of hours he worked in a week, and he was not compensated in terms of money for that time. (*Gulick Dep.*, 50:2-10.)  Instead, if he had a "doctor's appointment or something, [he] wouldn't have to use sick leave or vacation." (*Id*. at 50:11-14.)  Mortimer kept track of Gulick's compensatory time. (*Id*. at 50:14-15.)  Because he was terminated in 2010, the City compensated Gulick, at straight time, for the 16.5 hours of compensatory time he accrued that year. (*Id*. at 57:3-5, 58:9-13.)

While Gulick worked for the City, he never informed anyone that he accrued compensatory time. (*Id*. at 57:21-58:4.)  Rather, he accrued compensatory time when

6

Mortimer informed him that he had to attend meetings or be at work at specific times. (*Id*.) And, when he worked overtime hours while employed by the City, Gulick never requested approval in advance to work overtime, nor did he receive written authorization from anyone in the City to work such overtime hours. (*Def.'s SMF*, ¶¶ 52-53; *Plf.'s SMF*, ¶¶ 52-53.) Gulick testified that Councilman Lombardo and Mortimer were aware that he worked overtime on occasion because he would see Councilman Lombardo early in the morning or he would tell Mortimer that he was coming in early the next day when he needed to see contractors or issue permits. (*Gulick Dep.*, 26:12-17, 27:14-17, 29:18-30:17.) While Councilman Lombardo was not aware on a regular basis whether Gulick arrived at work early in the morning, he would occasionally come in early and see Gulick at work. (*30(b)(6) Dep.*, 106:19-107:4.)

During Gulick's employment, there were no forms for employees to obtain written authorization to work overtime. (*Gulick Dep.*, 27:22-24, 29:8-10.) According to Moskovitz, the City still does not have a form for an employee to fill out in advance to request permission to work overtime. (*Moskovitz Dep.*, 53:6-8.)

## B.    Procedural History

Gulick commenced this action on January 25, 2012. The Complaint set forth claims for deprivation of Gulick's First Amendment rights, denial of his Fourteenth Amendment due process rights, wrongful termination in violation of public policy, and violations of the FLSA. The wrongful termination claim was withdrawn by Gulick, and the City moved to dismiss the Fourteenth Amendment claim pursuant to Federal Rule of Civil Procedure 12(b)(6). *See Gulick v. City of Pittson*, No. 12-141, 2012 WL 2154178, at *1 n.1 (M.D. Pa. June 13, 2013). Although Gulick had a protected property interest in his position by way of City Ordinance No. 10 of 2006, the City's motion to dismiss the Fourteenth Amendment claim was granted because Gulick was afforded all process due as "he received a constitutionally adequate

pre-deprivation hearing and then failed to avail himself of potential post-deprivation remedies under state law." *Id*. at *2-3.

Thereafter, Gulick filed his Amended Complaint pursuant to a stipulation between the parties. (*Am. Compl.*) The Amended Complaint asserts claims for violation of the First Amendment (Count One), violation of the FLSA (Count Two), and violation of the Pennsylvania Wage Payment and Collection Law (Count Three). The City filed an Answer to the Complaint with Affirmative Defenses (Doc. 21), and the action proceeded to discovery.

Following the close of discovery, the City filed the instant motion for summary judgment. (Doc. 27.) Gulick filed a timely brief in opposition, (Doc. 35), and the City filed a timely reply brief in further support of its motion. (Doc. 41.) The City's motion for summary judgment is now fully briefed and ripe for disposition.

## II. Discussion

### A. Legal Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Wright v. Corning*, 679 F.3d 101, 103 (3d Cir. 2012) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)). A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

Where there is no material fact in dispute, the moving party need only establish that

it is entitled to judgment as a matter of law. *See Edelman v. Comm'r of Soc. Sec.*, 83 F.3d 68, 70 (3d Cir. 1996). Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *Anderson*, 477 U.S. at 248, 106 S. Ct. 2505. An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id*. Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law. *See Howard Hess Denal Labs., Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 251 (3d Cir. 2010). The moving party may present its own evidence or, where the non-moving party has the burden of proof, simply point out to the court that "the non-moving party has failed to make a sufficient showing on an essential element of her case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

"When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). Once the moving party has satisfied its initial burden, the burden shifts to the non-moving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *Anderson*, 477 U.S. at 256-57, 106 S. Ct. 2505. The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990).

"To prevail on a motion for summary judgment, the non-moving party must show specific facts such that a reasonable jury could find in that party's favor, thereby establishing a genuine issue of fact for trial." *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265,

270 (3d Cir. 2007) (citing Fed. R. Civ. P. 56(e)). "While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla." *Id*. (quoting *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005)). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S. Ct. 2505.

**B.    First Amendment Claims**

Gulick's First Amendment association claims are brought pursuant to 42 U.S.C. § 1983. Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any citizen . . . or other person . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured, . . ." 42 U.S.C. § 1983. Section 1983 is not itself a source of substantive rights, but a method for vindicating federal rights secured by the United States Constitution or federal statutes. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85, 122 S. Ct. 2268, 153 L. Ed. 2d 309 (2002). This action implicates the constitutionally protected First Amendment right to freedom of association. *See Roberts v. United States Jaycees*, 468 U.S. 609, 617-18, 104 S. Ct. 3244, 82 L. Ed. 2d 462 (1984). Citizens have the freedom to associate for the purpose of engaging in free speech, assembly, petition for the redress of grievances, and the exercise of religion. *Id*. at 618, 104 S. Ct. 3244. Freedom of association also encompasses a freedom not to associate. *Id*. at 623, 104 S. Ct. 3244; *see also Cal. Democratic Party v. Jones*, 530 U.S. 567, 574, 102 S. Ct. 2402, 147 L. Ed. 2d 502 (2000) ("That is to say, a corollary of the right to associate is the right not to associate.").

"It is well established that the First Amendment protects public employees from

politically motivated termination unless party affiliation is an appropriate requirement for the effective performance of the public office." *Delhagen v. McDowell*, 703 F. Supp. 2d 467, 473 (M.D. Pa. 2010) (internal quotation and citation omitted). Third Circuit jurisprudence for cases raising claims of discrimination or retaliation based on political association is framed by the Supreme Court's "trilogy" of "political patronage cases." *Montone v. City of Jersey City*, 709 F.3d 181, 189 (3d Cir. 2013) (citing *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L. Ed. 2d 547 (1976); *Branti v. Finkel*, 445 U.S. 507, 100 S. Ct. 1287, 63 L. Ed. 2d 574 (1980); *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 110 S. Ct. 2729, 111 L. Ed. 2d 52 (1990)). Applying the principles set forth in those cases, the United States Court of Appeals for the Third Circuit developed a three-part test to establish a claim of discrimination based on political patronage in contravention of the First Amendment. *See Galli v. N.J. Meadowlands Comm'n*, 490 F. 3d 265, 271 (3d Cir. 2007). A *prima facie* case of political patronage discrimination requires the plaintiff to show three elements: (1) that he was employed at a public agency in a position that does not require political affiliation; (2) that he was engaged in constitutionally protected conduct; and (3) that this conduct was a substantial or motivating factor in the government's employment decision. *Id*. (citing *Stephens v. Kerrigan*, 122 F.3d 171, 176 (3d Cir. 1997)). If the plaintiff succeeds in making this showing, the defendant may avoid a finding of liability "'by proving by a preponderance of the evidence that the same employment action would have been taken even in the absence of the protected activity.'" *Id*. (quoting *Stephens*, 122 F.3d at 176).

Gulick contends that his First Amendment rights were violated in two respects. First, he asserts that he was terminated as a result of his political association and support of Keating. Second, he claims he was terminated based on his non-association with former Mayor Lombardo.

      **1.**      **Employment that Does Not Require Political Affiliation**

The parties agree that the first prong of the *Galli* test is satisfied. That is, the position held by Gulick- zoning officer/code enforcement officer/administrative assistant- is not one requiring political affiliation to effectively perform the duties of that office. *See Montone*, 709 F.3d at 189 (citing *Branti*, 445 U.S. at 518, 100 S. Ct. 1287).

## 2. Constitutionally Protected Conduct

Second, Gulick must demonstrate that he engaged in constitutionally protected conduct. "This prong is broad enough to encompass both the politically active and the apolitical employee." *Delhagen*, 703 F. Supp. 2d at 475. Stated differently, "the right not to have allegiance to the official or party in power itself is protected under the First Amendment, irrespective of whether an employee is actively affiliated with an opposing candidate or party." *Galli*, 490 F.3d at 272 (citing *Branti*, 445 U.S. at 519, 100 S. Ct. 1287). The Third Circuit has held that this prong can be met if the plaintiff "suffers because of active support for a losing candidate within the same political party." *Id*. (citing *Robertson v. Fiore*, 62 F.3d 596, 600-01 (3d Cir. 1995). The Third Circuit has similarly determined that the First Amendment protects a public employee from discrimination for failing to support the winning candidate. *See id*. at 272-73 (citing *Bennis v. Gable*, 823 F.2d 723, 731 (3d Cir. 1987)); *see also Saullo v. Borough of Nesquehoing*, No. 10-CV-824, 2011 WL 320566, at *3 (M.D. Pa. Jan. 28, 2011) ("Public agencies also violate the First Amendment when they demote or discharge public employees simply to make room for political supporters, because [a] citizen's right not to support a candidate is every bit as protected as his right to support one."). And, the Third Circuit has suggested that "the First Amendment protects an employee's failure to engage in any political activity whatsoever." *Galli*, 490 F.3d at 273 (citing *Bennis*, 823 F.2d at 727 n.4); *see also Wuestling v. Lackawanna Cnty.*, No. 12-CV-660, 2013 WL 785260, at *3 (M.D. Pa. Mar. 1, 2013) ("adverse employment action taken simply to create positions for political supports may also constitute political patronage

12

discrimination").

The City argues that Gulick "failed to put forth any evidence of [his] alleged political support of Mayor Keating in the 2009 municipal election when the City decided to terminate his employment." (Doc. 41, 19.) Developing the argument that Gulick did not engage in constitutionally protected activity, the City emphasizes that Gulick: (1) did not put up signs for Keating; (2) did not contribute to Keating's campaign; (3) did not pass out flyers or work the polls for Keating on election day; and (4) did not support Keating in any prior elections. (Doc. 30, 6 (citing *Def.'s SMF*, ¶¶ 10-16).)

In opposition, Gulick asserts that he engaged in constitutionally protected conduct. Specifically, he told City residents that Keating was one of the best, hard-working mayors he ever met, and he asked people to vote for Keating for re-election. (Doc. 35, 23 (citing *Plf.'s SMF*, ¶¶ 10, 17).) He spoke of Keating's positive qualities to both McClean and Councilman Lombardo. (*Gulick Dep.*, 37:17-38:12.) Gulick also supported Keating by attending a public rally. (*Id.* at 31:13-23.) With respect to the theoretical ways which the City asserts he could have further supported Keating, such as working the polls for Keating or contributing to his campaign, he maintains they do not negate the fact that he engaged in constitutionally protected conduct. (Doc. 33, 23.)

Here, there is some evidence in the record that Gulick supported Keating in his bid for re-election. In particular, Gulick testified that he asked people to vote for Keating, that he spoke positively about Keating's performance as mayor, and he attended a political rally in support of Keating. (*Gulick Dep.*, 31:2-6, 31:13-23, 32:8-17.) Conversely, the record contains evidence for which a finder of fact could conclude that Gulick did not engage in constitutionally protected conduct. Notably, Keating was not aware if Gulick actively supported his campaign, nor was he ever informed by Gulick that he had his support in his bid for re-election. (*Keating Aff.*, ¶¶ 2-3.) Moreover, Gulick did not donate to Keating's

campaign, distribute flyers for Keating, or work the polls on election day for Keating. (*Gulick Dep.*, 31:7-12, 31:24-32:7.)  Based on these facts, Gulick has come forth with sufficient evidence which would allow a reasonable jury to conclude that he engaged in constitutionally protected conduct.

### 3.    Substantial or Motivating Factor

Lastly, Gulick must establish that his constitutionally protected conduct was a "substantial or motivating factor" in the decision to terminate his employment. *See Galli*, 490 F.3d at 275. "'Implicit in this prong is a requirement that the plaintiff produce sufficient evidence to show that the defendant knew of the plaintiff's political persuasion,' which requires proof of both knowledge and causation." *Id*. (quoting *Goodman v. Pa. Turnpike Comm'n*, 293 F.3d 655, 664 (3d Cir. 2002)).  Proof of knowledge and causation can come from either direct or circumstantial evidence. *See Delhagen*, 703 F. Supp. 2d at 476 (citing *Goodman*, 293 F.3d at 664).

### a.    Knowledge

Here, the City argues that Gulick failed to present any evidence that anyone from the City was aware of his claimed political support for Keating.  In particular, the City asserts that Gulick assumed that Klush and Councilman Lombardo were aware of his political support of Keating in the 2009 primary election, Gulick was unaware that Councilman Lombardo and Chernouskas were on the same ticket as Keating in the 2009 primary election in opposition to Klush, and Gulick did not know that McClean was the treasurer of Keating's political committee for the 2009 primary election. (Doc. 30, 9-10.)

In opposing the City's motion for summary judgment, Gulick contends that the record demonstrates that the councilmen that now serve as part of the Klush administration knew that he supported Keating. (Doc. 35, 25.)  Specifically, Gulick testified that he had conversations with McClean and Councilman Lombardo during which he expressed his

support for Keating. (*Gulick Dep.,* 37:17-38:12.)

Viewing all of the facts in the light most favorable to Gulick, he has presented sufficient evidence for which a reasonable finder of fact could find that City Council members were aware that Gulick supported Keating.  In particular, although the City relies heavily on the fact that the councilmen that terminated Gulick's employment ran on the same ticket as the candidate Klush defeated in the 2009 primary election, the evidence also indicates that these councilmen are considered part of the Klush administration, and they are involved in a "collaborative process" in setting the City's agenda. (*30(b)(6) Dep.*, 13:3-18, 88:7-22.)  And, the City's corporate designee that indicated he was part of the Klush administration, Councilman Lombardo, is one of the individuals Gulick testified was aware of his support for Keating in the 2009 primary election. (*Gulick Dep.*, 38:1-12.)  On this record, Gulick has presented sufficient evidence for which a jury could find that the City had knowledge of his political association.

### b.     Causation

The second component of the "substantial or motivating factor" prong for political patronage discrimination cases requires Gulick to demonstrate causation.  To establish causation, Gulick must produce sufficient evidence from which a reasonable jury could conclude that his political affiliation was a "substantial or motivating factor" in the adverse employment action. *See Galli*, 490 F.3d at 276.   In the context of First Amendment retaliation claims:

> To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link.  In the absence of that proof the plaintiff must show that from the evidence gleaned from the record as a whole the trier of the fact should infer causation.

*Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007) (citations, internal citations, and quotations omitted); *see also Vaticano v. Twp. of Edison*, 514 F.

15

App'x 218, 225 (3d Cir. 2013) (causal link necessary to establish a First Amendment retaliation claim is "[s]imilar to a claim based on political discrimination"); *Young v. Kisenwether*, No. 12-379, 2013 WL 5970126, at *4 (M.D. Pa. Nov. 8, 2013).

The City will be granted summary judgment on Gulick's First Amendment claims because he has failed to present evidence that his political affiliation with Keating was a "substantial or motivating factor" in his termination. First, Gulick's support of Keating and his termination fails to satisfy the "unusually suggestive temporal proximity" standard of causation. *See Lauren W.*, 480 F.3d at 267. While the "'mere passage of time is not legally conclusive proof against retaliation, . . . the passage of an extended period of time between protected activity and an alleged retaliatory action weighs against a finding of a causal link where there is no evidence of retaliatory animus during the intervening period.'" *Perna v. Twp. of Montclair*, 409 F. App'x 581, 584 (3d Cir. 2011) (quoting *Shaner v. Synthes*, 204 F.3d 494, 505 (3d Cir. 2000)). Here, Gulick was terminated in September 2010, which was approximately sixteen (16) months after he supported Keating in the 2009 primary election and eight (8) months after Klush assumed office in January 2010. This timing is not so "unusually suggestive" as to give rise to an inference of causation. *See, e.g., Revell v. City of Jersey City*, 394 F. App'x 903, 907 (3d Cir. 2010) (alleged retaliatory action which occurred one year later insufficient to satisfy "unusually suggestive temporal proximity" standard); *C.M v. Board of Educ. of Union Cnty. Reg'l High Sch. Dist.*, 128 F. App'x 876, 883 (3d Cir. 2005) (three-month gap between protected conduct and alleged retaliatory action was not "unusually suggestive" of improper motive); *Carroll v. Clifford Twp.*, No. 12-553, 2013 WL 6244558, at *4 (M.D. Pa. Dec. 3, 2013) (eighteen months was not "unusually suggestive"); *Buck Foston's New Brunswick LLC v. Cahill*, No. 11-03731, 2013 WL 5435289, at *15 (D.N.J. Sept. 27, 2013) (five months not "unusually suggestive"); *Fisher v. Transue*, No. 04-CV-2756, 2008 WL 3981521, at *10 (M.D. Pa. Aug. 22, 2008) (noting that

Third Circuit precedent "suggest[s] that the difference in time must be measured in days, rather than in weeks or months, to establish causation on its own," and finding a "period of twenty-two days is too lengthy to give rise to an inference of causation"); *Conklin v. Warrington Twp.*, No. 06–2245, 2008 WL 2704629, at *12 (M.D. Pa. July 7, 2008) (two month period not so "unduly suggestive as to give rise to an inference of causation").

Second, there is no evidence in the record to establish causation through "a pattern of antagonism coupled with timing." *See Lauren W.*, 480 F.3d at 267. Gulick has not argued that a pattern of antagonism existed during his employment with the City, and a review of the record does not demonstrate that such circumstances existed.

Thus, because Gulick fails to establish causation through "unusually suggestive temporal proximity" or a "pattern of antagonism," he must show that the trier of fact should infer causation from the evidence gleaned from the record as a whole. *See Lauren W.*, 480 F.3d at 267. Here, considering the record in its entirety, a reasonable finder of fact could not infer causation and conclude that Gulick was terminated based on his association with Keating. At most, the record indicates that the hiring of Moskovitz occurred under unusual circumstances, namely, the meeting at Rose Randazzo's office prior to Gulick's termination, the drafting of two resolutions to hire Moskovitz before the position was advertised and Gulick was terminated, the advertisement of the position for three days, and the ultimate hiring of Moskovitz four days after the last advertisement for the position was published. However, these circumstances do not demonstrate that Gulick suffered adverse employment action because of his political association.[4] Moreover, considering these facts

---

[4]     Gulick also contends that his claim is supported by the fact that "[f]urther evidence that Klush punished those who supported his opponent in the mayoral election is that shortly after becoming mayor he demoted long time Pittston police officer, Police Chief Jeff Tayoun ["Tayoun"]." (Doc. 35, 14 (citing Fed. R. Evid. 404(b))); *cf. Ansel v. Green Acres Contracting Co.*, 347 F.3d 515, 525 (3d Cir. 2003) ("Evidence of an employer's conduct towards other employees has long

in view of the record in its entirety, there is nothing connecting Gulick's termination to his political association or his support for Keating in the 2009 primary election. *Cf. Delhagen*, 703 F. Supp. 2d at 477 (finding an issue of fact as to causation on political patronage discrimination claim where the plaintiff's termination letter stated that "the new administration desires to have the supervisory and management positions held by individuals with which the Controller is familiar and who share his management philosophy."). As such, a reasonable fact finder could not infer that Gulick's association with Keating was a "substantial or motivating factor" in his termination. Merely because Gulick claims he engaged in constitutionally protected First Amendment association and the City took action with which he disagreed does establish political patronage discrimination. The City is entitled to summary judgment on Gulick's claim that he was terminated based on his association with Keating.

In addition to arguing that he was terminated because of his association with Keating, Gulick also contends that the evidence establishes that he was terminated as a result of his non-association with former Mayor Lombardo. Gulick asserts: he was "terminated in order to make room for Joseph Moskovitz, who was picked by former Mayor Lombardo, who had significant political influence in Pittston"; the termination was "to make room for Mr.

---

been held relevant and admissible to show that an employer's proffered justification is pretext."). Tayoun's demotion occurred at the first meeting after Klush took office in January 2010. (*30(b)(6) Dep.*, 115:12-121:12.) A reasonable fact finder could not infer causation and find that Gulick's association with Keating was a "substantial or motivating factor" in his adverse employment action in this case simply because another Keating supporter was demoted eight months before Gulick was terminated. *See, e.g., Young*, 2013 WL 5970126, at *7 (rejecting the plaintiff's argument that the "dismissal of the zoning officer, a candidate that opposed both defendants in 2009 and 2011, as evidence of other politically motivated firings," since "the fact that he filed a lawsuit against the same defendants [does not] demonstrate discrimination"). As in *Young*, the demotion of Tayoun does not create a triable issue of fact regarding causation. *See id*.

Moskovitz, who former Mayor Michael Lombardo wanted in that position (the evidence shows that former Mayor Lombardo, despite being 'former,' controlled much of Pittston politics)"; and he was terminated "to make room for a political ally of powerful politicians in Pittston." (Doc. 35, 16, 19, 31.)

As indicated, "adverse employment actions taken against public employees merely 'to make positions available for political supporters' could amount to political discrimination." *Galli*, 490 F.3d at 273 (quoting *Bennis*, 823 F.2d at 731). Nevertheless, a reasonable jury could not conclude that Gulick was terminated because of his non-association with former Mayor Lomardo. Significantly, Gulick fails to substantiate his arguments with citations to the record. The record does not reflect that former Mayor Lombardo "controlled much of Pittston politics," or that Moskovitz was a "political ally" or "political supporter" of powerful Pittston politicians. Rather, the record establishes that Moskovitz met former Mayor Lombardo when he was the Dallas Borough Manager and former Mayor Lombardo was president of the Wilkes-Barre Chamber of Commerce, (*Moskovitz Dep.*, 9:16-19), that they did not keep in touch, (*id*. at 11:7-11), that former Mayor Lombardo thought Moskovitz would be a capable employee because he had prior municipal experience, (*30(b)(6) Dep.*, 50:12-21, 51:16-52:4), and that former Mayor Lombardo was the first person from the City to contact Moskovitz about the potential employment opportunity. (*Id*. at 52:6-9.) These facts do not establish that Moskovitz was sought for the position because he was politically aligned with Pittston politicians, nor does it indicate that Gulick was discharged to make room for a "political supporter" of former Mayor Lombardo. Thus, a reasonable jury could not infer that Gulick's non-association with former Mayor Lombardo was a "substantial or motivating" factor in his termination, and, as such, the City will be granted summary judgment on Gulick's non-association claim.

Based on the foregoing, Gulick's First Amendment claims are unable to withstand

the City's motion for summary judgment. Accordingly, the City's motion for summary judgment on Count One of the Amended Complaint will be granted.

## C. FLSA Claim

Count Two of the Amended Complaint sets forth a claim for violation of the Fair Labor Standards Act of 1938. Specifically, Gulick contends that the City violated the FLSA's overtime provisions by providing compensatory time in lieu of overtime pay, paying compensatory time at straight time rather than at time-and-a-half, and by failing to compensate him for all hours worked. (Doc. 35, 27-29.)

Among other requirements, the FLSA mandates an employer to compensate its employees for work in excess of forty (40) hours per week at a rate of one and one-half times the employees' regular wages. *See* 29 U.S.C. § 207(a)(1); *Christopher v. SmithKline Beecham Corp.*, - - - U.S. - - -, 132 S. Ct. 2156, 2162, 183 L. Ed. 2d 153 (2012).[5]

The City's motion for summary judgment on the FLSA claims is premised on its position that it did not have actual or constructive knowledge of the alleged unpaid overtime hours worked by Gulick.[6] The City also asserts that Gulick failed to notify his supervisors

---

[5]   The overtime compensation requirement is not applicable to all employees. *See* 29 U.S.C. § 213. The parties have not argued that an exemption to the overtime compensation requirement applies in this case.

[6]   The City notes that the "statute of limitations for FLSA claims is two years, unless the violation is willful, in which case it is three years." *Abulkhair v. PPI/Time Zero, Inc.*, 398 F. App'x 710, 711 (3d Cir. 2010) (citing 29 U.S.C. § 255(a)). Without conceding the issue of willfulness and for purposes of its summary judgment motion only, the City assumes that a three-year limitations period applies to the FLSA claims in this case. Because the action was commenced on January 25, 2012, the City argues that, applying the three-year limitations period, Gulick's FLSA claims for any weeks prior to January 25, 2009 are barred by the statute of limitations. (Doc. 30, 13.) "Under the FLSA, a cause of action accrues for overtime compensation at each regular payday immediately following the work week during which the services were rendered." *Guenzel v. Mount Olive Bd. of Educ.*, No. 10-4452, 2012 WL 556256, at *2 (D.N.J. Feb. 16, 2012) ("repeated

that he was working overtime through the established record-keeping system.

In opposition, Gulick maintains that the City's knowledge that he worked overtime is confirmed by Councilman Lombardo's deposition testimony. He further asserts that the City violated the FLSA by providing compensatory time at straight time and not time-and-a-half when he worked overtime.[7]

"Plaintiff-employees asserting FLSA claims bear the burden of proving they performed work for which they were not paid. To recover for such uncompensated overtime work, a plaintiff must demonstrate that the defendant-employer had either actual or constructive knowledge of the plaintiff's overtime work." *Alers v. City of Phila.*, 919 F. Supp. 2d 528, 558 (E.D. Pa. 2013) (citation and internal citation omitted). Thus, "[w]here an employer has no knowledge that an employee is engaging in overtime work and that employee fails to notify the employer or deliberately prevents the employer from acquiring knowledge of the overtime work, the employer's failure to pay for the overtime hours is not a violation of the FLSA." *Stanislaw v. Erie Indem. Co.*, No. 07-1078, 2012 WL 517332, at *4 (W.D. Pa. Feb. 15, 2012) (quotation and citation omitted). Restated, an employer does not violate the FLSA when its employee performs uncompensated work but deliberately prevents the employer from discovering it. *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495

---

failures to properly compensate employees for overtime are not treated as continuing violations but as repeated violations of an identical nature. Because each FLSA violation gives rise to a new cause of action, each failure to pay overtime begins a new statute of limitations period as to that particular event."). Accordingly, Gulick's claims for overtime earned prior to January 25, 2009 are barred by the statute of limitations.

[7] As to this issue, although he did not move for summary judgment, Gulick asserts that he will be entitled to a directed verdict in his favor at trial as to this aspect of his FLSA claim. (Doc. 35, 30-31.) The City did not address Gulick's contention in its reply brief. (Doc. 41.) Because Gulick did not move for summary judgment on this issue, his argument will not be addressed at this time.

F.3d 1306, 1319 (11th Cir. 2007) (citing *Forrester v. Foodliner*, 646 F.2d 413, 414 (9th Cir. 1981)).

An employer, however, may not stand idly by and permit an employee to work overtime without proper compensation, even in cases where the employee does not submit a claim for overtime compensation. *Forester*, 646 F.2d at 414. And, "[w]here an employer does not desire that an employee work overtime, the employer is responsible to make every effort to prevent the employee from working overtime." *Alers*, 919 F. Supp. 2d at 558 (citing *Prise v. Alderwoods Grp., Inc.*, 817 F. Supp. 2d 651, 662 (W.D. Pa. 2011). "'This duty arises even where the employer has not requested the overtime be performed or does not desire the employee to work, or where the employee fails to report his overtime hours.'" *Prise*, 817 F. Supp. 2d at 662 (quoting *Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 288 (2d Cir. 2008)). So long as the employer knows or has reason to know that the employee continues working, those hours must be counted. *See Allen*, 495 F.3d at 1314 (quoting *Reich v. Dep't of Conservation and Nat. Res.*, 28 F.3d 106, 1082 (11th Cir. 1994)). "In order to prevail on an FLSA claim for unpaid overtime, an employee must prove that they 'were suffered or permitted to work without compensation.'" *Stanislaw*, 2012 WL 517332, at *3 (quoting *Allen*, 495 F.3d at 1314).

The City's motion for summary judgment on Gulick's failure to pay overtime claim will be denied. Based on the evidence of record, there is a genuine factual dispute as to whether the City had actual or constructive knowledge that Gulick worked overtime hours and whether Gulick was suffered or permitted to work overtime without compensation.

For instance, there is evidence in the record which supports Gulick's contention that the City had knowledge that he worked uncompensated overtime. Gulick testified that he orally requested to work overtime to Councilman Lombardo, that Councilman Lombardo would see him early in the morning when Gulick came in to issue permits to contractors,

(*Gulick Dep.*, 26:8-17), and that he would inform Mortimer in advance that he was going to be at work early the next day to issue construction permits. (*Id*. at 30:9-17.) Additionally, employees for the City would not mark their time sheets for the number of hours they worked, but instead would only put "P" for present if they worked on a given day. (*Gulick Dep.*, 21:2-6.) Furthermore, the City kept track of some of Gulick's compensatory time, which is confirmed by the fact that he was paid for his unused compensatory time following his termination. (*Id*. at 50:14-15, 57:3-5, 58:9-13.) And, the City did not provide overtime request forms, (*id*. at 27:23-24; *see also Moskovitz Dep.*, 53:6-8), despite the City's policy which states that an employee must obtain written authorization to work overtime "on forms to be provided by the employer." (*Def.'s SMF*, Ex. F.)

There is, on the other hand, evidence in the record which could support the conclusion that the City did not have actual or constructive knowledge that Gulick worked overtime hours without compensation. For example, Gulick never requested to work overtime hours in writing, nor did he ever obtain written authorization prior to working overtime. (*Gulick Dep.*, 25:16-24.) Gulick did not record on his time sheets when he worked more than his allotted 7.5 hours, (*id*. at 25:4-11), even though these time sheets were signed by both Gulick and his supervisor. (*Id*. at 20:5-19.) Gulick also never informed his supervisor when he accrued compensatory time. (*Id*. at 57:21-58:4.) Moreover, although Councilman Lombardo would see Gulick in the morning on occasion if they were both in the office early, Councilman Lombardo also testified that many times he would be in the office in the afternoon and Gulick would be gone for the day, (*30(b)(6) Dep.*, 106:2-107:4), which could lead to the conclusion that Councilman Lombardo was not aware that Gulick worked overtime hours.

In view of this conflicting evidence, there is a dispute of fact as to whether the City had actual or constructive knowledge that Gulick worked overtime. *See, e.g., Holzapfel v.*

*Town of Newburgh*, 145 F.3d 516, 521 (2d Cir. 1998) ("The jury was to decide as a question of fact, not only how much of plaintiff's time . . . fell within the court's definition of 'work' and would be compensable, but also how much of that time was spent with the employer's actual or constructive knowledge."). Moreover, the City's claim summary judgment is warranted because Gulick did not notify it of overtime hours he worked through the established overtime record-keeping system is unconvincing. The record indicates that the City did not fully implement its overtime record-keeping system because overtime authorization forms were not provided to City employees in accordance with the Administrative Staff Policy. The City's motion for summary judgment on Gulick's FLSA claims will be denied.

### III. Conclusion

For the above stated reasons, the City's motion for summary judgment will be granted in part and denied in part. Summary judgment will be granted in favor of the City on Gulick's First Amendment and Pennsylvania Wage Payment and Collection Law claims. The City's motion for summary judgment on the FLSA claim will be denied.

An appropriate order follows.


January 17, 2014                                              /s/ A. Richard Caputo
Date                                                                  A. Richard Caputo
                                                                         United States District Judge